UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
UNITED STATES OF AMERICA ex rel.     :
DANIEL KIRK,     :
     :
         Plaintiff,     :     05 Civ. 2917 (SHS)
     :
     -against-     :
     :     OPINION AND ORDER
SCHINDLER ELEVATOR CORPORATION,     :
     :
         Defendant.     :
---------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

       Daniel Kirk ("Kirk" or "relator") brings this action on behalf of the United States under
the qui tam provisions of the False Claims Act (the "FCA"),  31 U.S.C. §§ 3729-33, against
defendant Schindler Elevator Corporation.  Schindler is a party to numerous contracts with the
federal government for the manufacture, installation, and maintenance of elevators and escalators
in government buildings.  As a government contractor, Schindler is subject to the Vietnam Era
Veterans Readjustment Assistance Act ("VEVRAA"), 38 U.S.C. § 4212.  VEVRAA and its
implementing regulations require government contractors such as Schindler to establish
affirmative action programs for covered veterans, invite their employees to identify themselves
as covered veterans, and file annual reports—known as "VETS-100" reports—with the United
States Department of Labor detailing the number of covered veterans they employ.  38 U.S.C.
§ 4212; 41 C.F.R. § 61-250.10; 48 C.F.R. §§ 52.222-35 to -38.  According to Kirk, Schindler has
failed to comply with these requirements for a number of years.

       Kirk alleges that, despite its noncompliance with VEVRAA, Schindler nevertheless
submitted to agencies of the United States hundreds of requests for payment under its

government contracts, each of which was a "false or fraudulent claim" rendering Schindler liable to the United States for a civil penalty of $5,500 to $11,000 as well as three times any damages sustained by the government.  31 U.S.C. § 3729(a)(1)-(2); 28 C.F.R. § 85.3(a)(9).[1]  Kirk seeks to share in the government's recovery pursuant to 31 U.S.C. § 3730(d)(2), which provides that a qui tam relator who brings a successful suit without government intervention is entitled to a "reasonable" portion of not less than twenty-five and not greater than thirty percent of the government's proceeds.

Schindler now moves to dismiss the complaint, contending, first, that most of Kirk's allegations fail to state a claim under the FCA, and second, that this Court lacks subject-matter jurisdiction over the remaining allegations.  In particular, Schindler argues that because relator's properly stated FCA claims stem from information obtained through responses to a series of Freedom of Information Act ("FOIA") requests submitted by him[2] to the U.S. Department of Labor ("DOL"), the action is "barred" by 31 U.S.C. § 3730(e)(4)(A), which strips federal courts of jurisdiction over qui tam actions "based upon the public disclosure of allegations and transactions in a[n] . . . administrative . . . report, hearing, audit, or investigation unless the . . . person bringing the action is an original source of the information."  31 U.S.C. § 3730(e)(4)(A).[3]

Kirk contends that all of his allegations state FCA claims and that the jurisdictional bar does not apply to any of them for at least four reasons.  Kirk claims, first, that the FOIA requests did not "publicly disclose" the information; second, that the DOL's responses to those requests

---

[1] The civil penalties authorized by statute were slightly lower for false claims presented to the government between 1986 and September 29, 1999.  They were set at not less than $5,000 and not more than $10,000.  See False Claims Amendments Act of 1986 § 2, Pub. L. 99-562, 100 Stat 3153 (codified at 31 U.S.C § 3729(a)); 28 C.F.R. § 85.3.

[2] As discussed below, each of the FOIA requests was actually submitted by relator's wife, Linda Kirk.  It is undisputed that the requests were submitted on relator's behalf, and accordingly, on occasion, for the purposes of brevity and clarity, the Court refers to the requests as submitted by relator.

[3] Schindler also contends dismissal is appropriate because, first, relator has failed to plead fraud with the specificity required by Fed. R. Civ. P. 9(b), and second, pursuant to the doctrine of "primary jurisdiction," the Court should defer to an ongoing administrative investigation of Schindler's claims.  However, neither contention is necessary to resolve defendant's motion, and accordingly, the Court does not address either.

were not "administrative reports" or "investigations" within the meaning of the statute; third, that the FOIA responses did not reveal the fraudulent "allegations or transactions" underlying his claims; and finally, that his action is not "based upon" the information obtained through his FOIA requests since Kirk, as a former Schindler employee, had independent knowledge of the alleged false claims.

The Court finds, first, that most of Kirk's allegations fail to state a claim upon which relief can be granted pursuant to the FCA, and second, that those of Kirk's allegations that do properly state FCA claims are barred by section 3730(e)(4)(A) as "publicly disclosed." Accordingly, defendant's motion to dismiss the amended complaint is granted.

## I.  BACKGROUND

Unless otherwise noted, the following facts are taken from the amended complaint and are presumed to be true:

### A.    The Parties

Schindler Elevator Corporation manufactures, installs, and services elevators and escalators and has offices throughout the United States.  (Am. Compl. ¶¶ 2, 12-13.)  In 1989, Schindler acquired Millar Elevator Industries, Inc., and the two companies merged in 2002.  (Id. ¶ 12.)

Relator Daniel Kirk, a veteran of the United States Army who served on active duty during the Vietnam War, has worked in the elevator industry since 1968.  (Id. ¶¶ 19, 25.)  From 1978 until 2003, Kirk was employed by Millar and Schindler (collectively, "Schindler") in various supervisory, managerial, and executive capacities.  (Id. ¶¶ 11, 19-21, 28.)  In August 2003, Kirk resigned from Schindler as a result of what he characterizes as Schindler's attempts to "force[] [him] out of the company."  (Id. ¶ 24.)  Since then, Kirk has been an active litigant

against his former employer, commencing four separate legal or administrative proceedings against Schindler, all alleging claims stemming from his employment with and separation from the company.  (Aff. of Daniel E. Kirk, Jr. dated Sept. 27, 2007 ("Kirk Aff.") ¶¶ 12-24); (Def. Mem. of Law in Supp. of Summ. J. at 3-4.)

      B.     <u>VEVRAA and Schindler's Alleged Noncompliance</u>

All federal procurement contracts for non-personal services including construction that meet or exceed certain monetary thresholds are subject to VEVRAA.  38 U.S.C. § 4212(a)(1). That Act and its various implementing regulations set forth a series of requirements for all contracts subject to its provisions, three of which are relevant to this litigation: First, each contract subject to VEVRAA must "contain a provision requiring that the [contractor] take affirmative action to employ and advance in employment [certain covered] veterans."  38 U.S.C. § 4212(a)(1).  Second, every such contract must include language requiring the contractor to "invite all . . . eligible veterans who wish to benefit under the affirmative action program . . . to identify themselves to the [c]ontractor."  48 C.F.R. §§ 22.1310(b), 52.222-37(e).  Third, to satisfy VEVRAA's requirement that all covered contractors "report, at least annually, to the Secretary of Labor" on such issues as "the number of such employees, by job category and hiring location, who are qualified covered veterans," 38 U.S.C. § 4212(d), VEVRAA-covered contracts must contain a clause providing that the "[c]ontractor shall submit VETS-100 Report[s] . . . no later than September 30 of each year."  48 C.F.R. §§ 22.1310(b), 52.222-37(c).

With regard to the third requirement, Congress passed the Veterans Employment Opportunities Act in 1998, which supplemented VEVRAA by providing that "no agency may obligate or expend funds . . . to enter into a contract [covered by VEVRAA] with a contractor from which a [VETS-100] report was required . . . with respect to the previous fiscal year if such

contractor did not submit such report." 31 U.S.C. § 1354(a).  To facilitate compliance, an implementing rule provides that "by submission of its offer, the offeror represents that, if it is subject to the reporting requirements [of VEVRAA] . . . it has submitted the most recent VETS-100 Report required of that [act]."  48 C.F.R. § 52.222-38.

During the period covered by the complaint, Schindler entered into hundreds of contracts with agencies of the federal government that were subject to VEVRAA and its various requirements.  (Am. Compl. ¶¶ 3, 13, 20, 44(a), 56, 81-87.)   While Kirk does not have access to any of the actual contracts or to a comprehensive list of all of Schindler's government contracts (id. ¶ 81), he submits, based on the requirements imposed by VEVRAA, that each contract must have contained provisions requiring Schindler to develop affirmative actions for veterans, to allow veterans to self-identify, and to submit annual VETS-100 Reports.  (Id. ¶¶ 81-87.)

Kirk proceeds to allege that Schindler failed to comply with all three requirements.  First, Kirk alleges generally that Schindler has no affirmative action program for veterans.  (Id. ¶ 29.) In support of the claim, Kirk asserts that while he was employed by Schindler as a supervisor and manager with responsibility for employment decisions within his department, he was never informed that Schindler had any policy to take affirmative action with respect to veteran employees.  (Id. ¶¶ 28, 57.)  Further, Kirk claims that Schindler's employee manual makes no mention of any affirmative action program for veterans.  (Id. ¶ 28.)

Second, Kirk alleges generally that Schindler failed to invite any of its employees to self-identify as veterans (id. ¶¶ 27, 58-59) and asserts in support of the claim that during his tenure as a Schindler employee he was never asked to self-identify as a veteran.  (Id. ¶ 26.)

Third, Kirk alleges that during several years covered by the complaint Schindler failed to comply with VEVRAA's reporting requirements, by either not filing the required VETS-100 reports with the DOL or by filing reports containing false or partial information.  (Id. ¶¶ 4, 60.)

In support of that third claim, Kirk relies on the DOL's responses to a series of FOIA requests submitted by his wife, Linda Kirk, seeking past VETS-100s filed by defendant with the DOL.  Relator's FOIA requests, and the DOL's responses, were as follows:

***First FOIA Request***: On November 4, 2004, Mrs. Kirk wrote to the DOL seeking VETS-100 reports filed by defendant in the years 2002, 2003, and 2004.  (Letter from Linda Kirk to Robert Wilson dated Nov. 5, 2004, Ex. G to Kirk Aff.)[4]  On February 11, 2005, Robert Wilson, the Chief of the Investigation and Compliance Division for DOL's Office of Veteran's Employment and Training responded, providing the report for 2004 and indicating that "no records . . . for the years 2002 and 2003 were found."  (Letter from Wilson to Kirk dated Feb. 11, 2005, Ex. G to Kirk Aff.)

***Second FOIA Request***:  On January 17, 2005, Mrs. Kirk wrote to the DOL seeking VETS-100 reports filed by defendant for the years 1998, 1999, 2000, and 2001. (Letter from Kirk to Wilson dated Jan. 17, 2005, Ex. H to Kirk Aff.)  In response, the DOL provided Schindler's 2001 report, and indicated that "no records . . . for the years 1998, 1999 and 2000" were found.  (Letter from Wilson to Kirk dated Sept. 29, 2005, Ex. H to Kirk Aff.)  The 2001 report, which covered the twelve-month period ending September 30, 2002, is referred to by Kirk as Schindler's "2002 Report."

---

[4] While each of the Kirks' FOIA requests was referenced in the complaint, the actual requests—and the DOL's responses—were not provided with the complaint, but were instead attached to relator's affidavit submitted in conjunction with this motion.  Because the requests and the DOL's responses pertain primarily to defendant's motion to dismiss for lack of jurisdiction, the court can and does look beyond the pleadings in order to satisfy itself that it has the authority to hear the action.  See Filetech S.A. v. Fr. Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998) (in resolving challenges to subject-matter jurisdiction, court can look beyond pleadings to satisfy itself that it has the authority to hear the case).

6

***Third FOIA Request***:  On April 10, 2007, Mrs. Kirk submitted a FOIA request for defendant's VETS-100 reports for the years 2005 and 2006.  (Facsimile from Kirk to Wilson dated Apr. 4, 2007, Ex. I to Kirk Aff.)  In response, the DOL provided each of the requested reports.  (E-mail from Eric Rudert, Ass't Dir., Office of Agency Mgmt. and Budget, U.S. Dep't of Labor, to Kirk dated May 14, 2007, Ex. I to Kirk Aff.)

In light of this correspondence and the reports produced to relator as a result, Kirk alleges the following: first, that defendant never submitted VETS-100 reports for the years 1998 to 2001, and 2003 (Am. Compl. ¶ 60); second, that defendant initially failed to submit a report for 2002, but, upon learning of Kirk's complaint to the DOL regarding this matter in 2004, belatedly submitted a 2002 Report (id. at ¶ 5); third, that the reports defendant did submit for the years 2002, 2004, 2005, and 2006, and that the DOL produced in response to the Kirks' FOIA requests, were incomplete, inaccurate, and improperly prepared.  (See e.g. Id. ¶¶  63, 68, 71-72.) Accordingly, Kirk concludes that during the entire period covered by the complaint, Schindler was not in compliance with VEVRAA's reporting requirements and therefore was "not eligible" for any of the contracts it received.  (Id. ¶ 8.)

C. Schindler's Submission of Allegedly False or Fraudulent Claims for Payment to the United States

The complaint alleges that "[s]ince at least March 1999, Schindler has submitted hundreds of claims to agencies of the United States government seeking payment for construction services" and that "those claims were false" (Am. Compl. ¶ 2) because "at all times . . . Schindler was in violation of VEVRAA and was not eligible for payment."  (Id. ¶ 8.)   While Kirk "cannot . . . identify all of the false claims for payment that were caused by Schindler's conduct," (id. ¶ 95) he does advance at least three ways by which Schindler's course of conduct resulted in false claims.  First, pursuant to 48 C.F.R. § 52.222-38, defendant "expressly certified

to the United States that it was in compliance" with the VETS-100 reporting requirement each time it submitted a bid for a VEVRAA-covered contract.  (Id. ¶¶ 75, 92.)  Those certifications were "false statements [made] to induce the government to enter into contracts for which Schindler was ineligible because it had not, in fact, complied with VEVRAA."  (Id. ¶ 79.)  Accordingly, Kirk argues that not only each bid, but also any claim for payment on a contract obtained as a result of those bids, constituted a false claim.

Second, because Schindler allegedly filed VETS-100 reports for several of the years covered by the complaint that were inaccurate, incomplete, or otherwise not in conformity with VEVRAA's requirements, it "knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts to induce the Government to approve and pay such false or fraudulent claims."  (Id. ¶ 91.)  Accordingly, Kirk contends that "each claim . . . seeking payment on a contract subject to VEVRAA for a fiscal year when [Schindler] had not filed an accurate VETS-100 represents a false or fraudulent claim for payment."  (Id. ¶ 93.)

Finally, Kirk implies that because Schindler did not have an affirmative action program for veterans or allow veterans to self-identify, each claim submitted was a false claim because "Schindler was in violation of VEVRAA and was not eligible for payment."  (Id. ¶ 74.)

## II.    ANALYSIS

### A.    The Motion to Dismiss Standard

Dismissal for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) is appropriate where a plaintiff has failed to plead "enough facts to state a claim for relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  For purposes of that motion, a court assumes the truth of all facts asserted in the complaint and draws all reasonable

inferences from those facts in favor of the plaintiff.  Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 154 (2d Cir. 2006).

By contrast, on a motion to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), "the party invoking federal jurisdiction bears the burden of establishing that jurisdiction exists."  Sharkey v. Quarantillo, 541 F.3d 75, 82-83 (2d Cir. 2008) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).  While the Court must accept as true all material facts alleged in the complaint, in resolving challenges to subject-matter jurisdiction the Court may look beyond the pleadings in order to satisfy itself that it has the authority to hear the action.  Filetech S.A. v. Fr. Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998) (citing Antares Aircraft, L.P. v. Fed. Republic of Nigeria, 948 F.2d 90, 96 (2d Cir. 1991)).

B.       The False Claims Act

The FCA empowers the United States or private citizens on behalf of the United States to recover treble damages from those who knowingly make false claims for money or property to the United States government.  The Act is designed to ensure that the federal government recovers "losses sustained as a result of fraud," S. Rep. No. 99-345, at 1 (1986) reprinted in 1986 U.S.C.C.A.N. at 5226, and provides an incentive to private citizens to bring suit on behalf of the government for a fraud about which they had personal knowledge by rewarding them with a portion of the government's recovery should they prevail.

To establish liability under the FCA, a plaintiff—whether the Attorney General or a relator—must establish that the defendant "(1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury."  Mikes v. Straus, 274 F.3d 687, 695 (2d Cir. 2001).  The term "claim" is defined by the Act to cover "any request or demand, whether under contract or otherwise, for

money or property." 31 U.S.C. § 3729(c). The phrase "false or fraudulent" is not statutorily

defined. However, because the FCA is "intended to reach all types of fraud . . . that might result

in financial loss to the Government," United States v. Neifert-White Co., 390 U.S. 228, 232

(1968), the U.S. Court of Appeals for the Second Circuit has held that the phrase "false or

fraudulent" claim is limited to "only those claims with the potential wrongfully to cause the

government to disburse money." Mikes, 274 F.3d at 696; see also id. ("[A]n improper claim is

aimed at extracting money the government otherwise would not have paid.").[5]

A false claim may take several forms. In particular, the Second Circuit has recognized a

distinction between "factually false" and "legally false" claims. While the former involves a

request for reimbursement for goods or services not actually provided or not accurately

described, the latter—often referred to as the "false certification theory"—applies where the

defendant has falsely certified compliance with federal regulations as a condition to payment of

its claim. See Mikes, 274 F.3d at 697.

Kirk here makes no allegation that Schindler submitted factually false claims, i.e., claims

for work not actually provided or inaccurately described. Instead, Kirk seeks to invoke the false

certification theory, alleging that Schindler either expressly or impliedly certified that it was in

compliance with VEVRAA's requirements in order to receive payments for which it was

ineligible.

*1. False Certification Theory*

First recognized by the Second Circuit in Mikes, 274 F.3d at 687, the false certification

theory of liability is predicated on a false representation of compliance with a federal statute or

---

[5] It is well established that for purposes of the FCA, the claim must be knowingly false, that is, made with "actual knowledge" or through "deliberate indifference" to the truth or falsity of the information, or in "reckless disregard" thereof. "Mere negligence" or an "innocent mistake" is insufficient. Chen-Chang Wang ex. rel. United States v. FMC Corp., 975 F.2d 1412, 1420. (9th Cir. 1992) (citing 31 U.S.C. § 3729(b)).

CRITICAL

regulation.  The theory is finite in scope, and claims may be legally false "only where a party certifies compliance with a statute or regulation as a <u>condition to</u> government payment."  <u>Id.</u> at 697 (emphasis added).  Accordingly, the theory does not apply to all instances of noncompliance.  In particular, it "does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions."  <u>Id.</u>

The Second Circuit has further delineated between "express" and "implied" false certification.  An express false certification claim is one "that falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." <u>Id.</u> at 698.   By contrast, an implied false certification occurs where defendant submits a claim that does not include an express representation of compliance but from which a factfinder could conclude that the defendant impliedly certified its continuing compliance with the relevant statute.  The Circuit has cautioned courts "not to read [the implied false certification] theory expansively" and accordingly, it is "appropriately applied only where the underlying statute or regulation upon which the plaintiff relies <u>expressly</u> states the provider must comply in order to be paid."  <u>Id.</u> at 699-700 (emphasis in original).

Determining whether Kirk has stated a claim under the false certification theory requires a close evaluation of VEVRAA and its implementing regulations in the context of each class of false claims alleged.

### 2. *Kirk's False Certification Claims*

As noted, Kirk's complaint can be read to set forth three different ways in which Schindler allegedly submitted false certification claims.  First, Schindler falsely certified compliance with its VETS-100 reporting requirements each time it submitted a bid pursuant to 48 C.F.R 52.222-38, rendering the ensuing contracts issued in reliance on those certifications

false claims.  Second, Schindler falsely certified its compliance with VEVRAA by submitting claims for payment on VEVRAA-covered contracts despite knowing that its VETS-100 reports were inaccurate, thereby rendering those claims false claims.  Third, Schindler falsely certified its compliance with VEVRAA by submitting claims for payment on VEVRAA-covered contracts while knowing it did not have affirmative action programs for veterans or a procedure to allow veterans to self-identify as required by the statute.

Defendant, in its motion to dismiss, contends that the "only allegation that provides a basis for a claim under the FCA is the allegation that Schindler failed to file . . . 'VETS-100 Reports.'"  (Def.'s Mem. of Law. in Supp. of Summ. J. at 1.)   The Court agrees—only Kirk's first theory validly states a claim under the FCA.

First promulgated in 2001, 48 C.F.R 52.222-38 provides that "[b]y submission of its offer, the offeror represents that, if it is subject to the reporting requirements of [VEVRAA], it has submitted the most recent VETS-100 Report required by that [Act]."  The language of the rule is clear—each bid submitted must contain an express representation that the offeror has complied with a particular provision of VEVRAA, i.e., that it has submitted its most recent VETS-100 report.  The rule followed the mandate of Congress that "no agency may obligate or expend funds . . . to enter into a contract [covered by VEVRAA] with a contractor from which a [VETS-100] report was required . . . with respect to the previous fiscal year if such contractor did not submit such report."  31 U.S.C. § 1354(a).  The certification required by 48 C.F.R. § 52.222-38 was therefore a condition to receiving a contract because no agency could enter into a contract with a bidder unless that bidder represented that it had submitted its most recent VETS-100 report.  Accordingly, as a matter of law, Kirk's allegation that (1) Schindler

submitted a bid covered by the rule,[6] and (2) therefore expressly certified that it had submitted its most recent VETS-100 report, (3) while knowing it had not submitted that report, (4) to win a contract it would otherwise not have been entitled to, and (5) that it was actually awarded[7] validly states a claim of express false certification under the FCA.

None of Kirk's other theories of liability under FCA state a claim because no other aspect of VEVRAA or its implementing regulations imposes either express or implied certification requirements.  Kirk's second theory of liability alleges that Schindler submitted false claims by seeking payment despite having filed <u>inaccurate</u> VETS-100 reports.  However, Kirk fails to point to any provision of VEVRAA that required defendant to expressly attest to the accuracy of the reports.  Kirk relies on the same rule—48 C.F.R § 52.222-38—and statute—31 U.S.C. § 1354(a).  However, neither the rule nor the statute speaks to the accuracy of the report: the rule requires only a representation that the latest report was filed, and the statute bars agencies from contracting only "if [the] contractor did not submit a [VETS-100] report."  31 U.S.C. § 1354(a).  Accordingly, the Court finds neither a basis for concluding that Schindler expressly certified that its reports were accurate nor a basis for concluding such a certification would have been a condition to payment.

The Court also finds no basis for concluding that Schindler impliedly certified the accuracy of its reports.  A claim of implied false certification exists only where the underlying statute "<u>expressly</u> states the provider must comply in order to be paid."  <u>Mikes</u>, 274 F.3d at 700

---

[6] Because 48 C.F.R. 52.222-38 imposes the certification requirement critical to Kirk's claim, any contracts awarded before its adoption in October 2001 which were not covered by its express certification requirement fail to state a claim under the FCA.  Those claims, therefore, are dismissed pursuant to Rule 12(b)(6).

[7] Numerous courts in this and other circuits have found that merely submitting a bid does not constitute a "claim" under the FCA.  Instead, a bid becomes a "claim" when the bid is accepted and the bidder granted the contract.  <u>See,</u> <u>e.g.,</u> <u>United States ex rel. Taylor v. Gabelli</u>, 345 F. Supp. 2d 313, 335-36 (S.D.N.Y. 2004) (dismissing FCA action brought against <u>unsuccessful</u> bidders) (collecting cases).   For purposes of this Opinion, the Court follows that body of precedent and limits relator's false certification theory claims to those instances where Schindler's bids were successful.

(emphasis in original).  Here, as noted, the statute says nothing about the accuracy of the report, and certainly does not state as an express condition to payment that the reports be accurate.[8]

Finally, Kirk's third theory of liability—that Schindler falsely certified its compliance with VEVRAA by submitting claims for payment while knowing that it did not have an affirmative action program for veterans or a procedure to allow veterans to self-identify as required by the statute—fails for similar reasons.  Kirk can point to no statutory provision or implementing rule requiring Schindler to expressly certify—as a condition to payment—that it had an affirmative action program.  Instead, Kirk argues that because VEVRAA mandates that each contract "shall contain a provision requiring that the party contracting with the United States take affirmative action to employ and advance in employment qualified covered veterans," 38 U.S.C. § 4212(a)(1), each time Schindler submitted a claim for a VEVRAA-covered contract, it impliedly certified compliance with the Act's provisions.  Kirk's argument fails because section 4212(a)(1) does not expressly state that a provider must comply—that is, must actually institute an affirmative action program—as a condition of payment.  Therefore, Schindler's submission of claims does not as a matter of law give rise to implied false certifications claims.[9]

None of the above is meant to suggest that "false is OK."  (Pl.'s Mem. of Law. in Opp. to Summ. J. at 3.)  It is simply to confirm that the FCA is not the appropriate avenue for challenging every alleged falsity submitted to the government or every instance of regulatory

---

[8] For the same reasons, the allegedly inaccurate reports also cannot state a claim under 31 U.S.C. § 3729(a)(2), which creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  Even assuming the VETS-100 reports constituted a "false record," those falsities did not "get a false or fraudulent claim paid" since the accuracy of the reports was not a condition to payment.

[9] At most, section 4212(a)(1) creates what the Second Circuit in Mikes termed "conditions of participation, rather than prerequisites to receiving reimbursement."  Mikes, 274 F.3d at 701-02.  As the Mikes court explained, while a continuing failure to comply with a condition of participation may be grounds to render a contractor ineligible for future participation in the government program, alleged individual instances of noncompliance with a condition of participation do not give rise to claims under the FCA.  Id. at 702.  Moreover, in this case, VEVRAA, much like the Medicare statute at issue in Mikes, creates an express procedure for bringing allegations of noncompliance with conditions of participation to the attention of the government.  See 38 U.S.C. § 4212(b).

noncompliance.  See Mikes, 274 F.3d at 697 ("[A] claim for reimbursement made to the government is not legally false simply because the [contractor] failed to comply with mandates of a statute, regulation, or contractual term that is only tangential to the service for which reimbursement is sought." (emphasis added)).  Instead, VEVRAA itself provides aggrieved veterans with a direct avenue for challenging a contractor's alleged noncompliance with the statute's requirements.  See 38 U.S.C. § 4212(b).  Specifically, "the veteran may file a complaint with the Secretary of Labor, who shall promptly investigate such complaint and take appropriate action."  Id.  Moreover, the Court notes that Kirk has in fact availed himself of that very procedure: on April 15, 2004, Kirk filed a complaint with the Secretary of Labor, the DOL's Office of Federal Contract Compliance Programs conducted an investigation, the investigation resulted in an official report finding no evidence of non-compliance, and Kirk has appealed that finding.  (Exs. A-C to Kirk Aff.)[10]

Accordingly, the Court concludes that Kirk has stated a claim cognizable under the FCA only with regard to bids submitted after adoption of 48 C.F.R 52.222-38 in October 2001 that led to the award of contracts covered by VEVRAA.  All of Kirk's other claims, including his second and third theories of liability, fail as a matter of law to allege a violation of the FCA and should therefore be dismissed.

C.    The FCA Jurisdictional Bar

As a limitation on the FCA's otherwise broad grant of authority to private citizens to bring actions on behalf of the United States, section 3730(e)(4)(A) of the Act strips courts of jurisdiction over claims that are:

---

[10] Because the Court, in considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), cannot look beyond the pleadings, the facts surrounding relator's administrative hearing, all of which were submitted with affidavits in conjunction with this motion, cannot and do not serve as a basis for the Court's ruling.  However, because they are undisputed and were submitted by the non-moving party, the Court includes them here simply for purposes of completing the narrative of the history of this case.

[B]ased upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

To evaluate whether a claim is in fact barred, courts consider three questions: "(1) whether there has been a 'public disclosure' of allegations or transactions, (2) whether the qui tam action is 'based upon' such publicly disclosed allegations, and (3) if so, whether the relator is the 'original source' of the information."  United States ex rel. Reagan v. E. Tex. Med. Ctr., 384 F.3d 168, 173 (5th Cir. 2004) (quoting United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co., 336 F.3d 346, 352 (5th Cir. 2003)).  The first—whether there has been a "public disclosure" of the allegations or transactions—is the "bedrock of 3730(e)(4)(A)'s jurisdictional bar,"  United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 322 (2d Cir. 1992), and consideration of it requires a two-step inquiry: first, a court must determine whether the "allegations or transactions" underlying the fraud were publicly disclosed, and second, it must find that the disclosure came via a manner set forth in the statute, that is, through an "enumerated source."  Id. at 323.[11]

Schindler contends that Kirk's properly stated FCA claims are based entirely upon information obtained through the DOL's responses to the Kirks' FOIA requests, that those responses constituted administrative investigations or reports as those terms are used in section 3730(e)(4)(A), that those investigations or reports publicly disclosed the allegations or transactions underlying his claims, and accordingly, that relator's claims are barred by statute.

---

[11] As discussed below, the question of whether the statute's list of sources is exclusive is the subject of a split of authority.  However, the Second Circuit has determined that section 3730(e)(4)(A)'s list of enumerated sources is exclusive.  Accordingly, for relator's claims to be barred, this Court must determine not only that a public disclosure occurred but also that it occurred through an enumerated source.  See United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 323 (2d Cir. 1992).

Kirk, for his part, contends that a response to a FOIA request is not an administrative investigation or report, and therefore, that DOL's responses did not publicly disclose the allegations or transactions via one of the statute's enumerated sources.  Moreover, Kirk argues his claims are not "based upon" those disclosures because he provides additional, independent evidence in support of his claims.  Alternatively, Kirk contends he is an "original source" of the information.

While the parties are thus in disagreement regarding each of the elements of the jurisdictional inquiry, the core of their dispute lies in how the Court should construe information obtained through a FOIA request for purposes of the section 3730(e)(4)(A) bar.  Both parties find support for their respective positions in the case law—while the Second Circuit has never addressed the issue, the question of whether information obtained through a FOIA request is "publicly disclosed" for purposes of section 3730(e)(4)(A) remains the subject of a split of authority among the other circuits[12] as well as the trial courts in this district.[13]

---

[12] The Third Circuit, in a widely cited opinion, has held that information obtained through a FOIA request was publicly disclosed through one of the statute's enumerated sources because the response constituted an administrative investigation and report.  See United States ex rel. Mistick PBT v. Hous. Auth. of the City of Pittsburgh, 186 F.3d 376, 382-84 (3d Cir. 1999) (Alito, J.); see also United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys., 384 F.3d 168, 175-76 (5th Cir. 2004) (same).  The Sixth and Tenth Circuits have taken the position that information obtained through a FOIA request is publicly disclosed for purposes of section 3730(e)(4)(A) without determining whether that section's list of enumerated sources is exclusive, and accordingly, whether a response to a FOIA request constitutes an administrative investigation or produces an administrative report.  See United States ex rel. Grynberg v. Praxair, Inc., 389 F.3d 1038 (10th Cir. 2004); United States ex rel. Burns v. A.D. Roe Co., 186 F.3d 717 (6th Cir. 1999) (same).  By contrast, the Ninth Circuit has held that a response to a FOIA request is not a public disclosure for purposes of the statutory bar unless the response "is from one of the sources enumerated in the statute."  United States ex rel. Haight v. Catholic Healthcare W., 445 F.3d 1147, 1153 (9th Cir. 2006).  And the Fourth Circuit, in a footnote to an unpublished opinion, has suggested that a response to a FOIA request is not an enumerated source, and accordingly, information thereby obtained is not barred by section 3730(e)(4)(A).  United States ex rel. Bondy v. Consumer Health Found., No. 00-2520, 2001 WL 1397852, at *2 n.2 (4th Cir. Nov. 9, 2001).

[13] See United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc., 495 F. Supp. 2d 375, 380 (S.D.N.Y. 2007) (suggesting in dicta that information obtained through state Freedom of Information Law request was publicly disclosed for purposes of § 3730(e)(4)).  But see United States ex rel. Pentagon Techs. Int'l. Ltd. v. CACI Int'l., Inc., No. 94-Civ.-2925, 1996 WL 11299, at *9 (S.D.N.Y. Jan. 4, 1996) (documents acquired under the FOIA are not publicly disclosed within the meaning of section 3730(e)(4)(A)).

A distinct split in authority also exists over whether the statute's enumerated list of sources of disclosure is exclusive.  Specifically, several courts have held that a response to a FOIA request is a "public disclosure" triggering the jurisdictional bar without finding the need to additionally consider whether it is a public disclosure via one of the statute's enumerated sources, see, e.g., United States ex rel. Grynberg v. Praxair, Inc., 389 F.3d 1038 (10th Cir. 2004), while others have found that a response to a FOIA request was not a disclosure via one of section 3730(e)(4)(A)'s enumerated sources and have stopped without addressing whether information obtained through a FOIA request was "publicly disclosed."  See United States ex rel. Bondy v. Consumer Health Found., No. 00-2520, 2001 WL 1397852, at *2 n.2 (4th Cir. Nov. 9, 2001).

The Second Circuit has held, in the context of a different form of disclosure, that section 3720(e)(4)(A)'s list of sources is "exclusive," see Doe, 960 F.2d at 323, and so for Kirk's claim to be barred, the allegations or transactions underlying his claims must have been publicly disclosed via one of section 3720(e)(4)(A)'s enumerated sources.  Resolving this motion, therefore, requires the Court to address two questions left open in this Circuit and subject to dispute in other circuits and the courts of this district: first, whether a response to a FOIA request qualifies as an administrative investigation or report within the meaning of section 3730(e)(4)(A) and, if so, whether information thereby obtained has been "publicly disclosed" for purposes of the statutory bar.

Because the Court finds, on these facts, (1) that the DOL's responses to the Kirks' FOIA requests constituted administrative investigations and reports, (2) that those investigations and reports publicly disclosed the allegations or transactions underlying Kirk's claims, (3) that those claims are "based upon" the public disclosure, and (4) that Kirk was not an original source of the information, it concludes that Kirk's remaining claims are statutorily barred.

*1.  Public Disclosure via an Enumerated Source*

As noted, the public disclosure inquiry consists of two distinct components.  First, a court must determine whether the allegations or transactions have been publicly disclosed, and second, if so, whether they have been disclosed through one of section 3730(e)(4)(A)'s enumerated sources.

a.        Public Disclosure . . .

Allegations of fraud are "publicly disclosed when they are placed in the 'public domain.'"  Doe, 960 F.2d at 322 (quoting United States ex rel. Dick v. Long Island Lighting Co., 912 F.2d 13, 18 (2d Cir. 1990)).  However, they need not be "widespread" or "widely disseminated."  Id. at 323.  In fact, the Second Circuit has cited approvingly the finding of another court that actual access by anyone other than the relator is irrelevant, because only "potential accessibility by those not a party to the fraud [is] the touchstone of public disclosure." Id. at 322 (emphasis added) (citing with approval United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149 (3d Cir. 1991)).  Accordingly, the Second Circuit has construed the public disclosure bar to preclude "qui tam suits based on information that would have been equally available to strangers to the fraudulent transaction had they chosen to look for it as it was to the relator."  United States ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1158 (2d Cir. 1993) (quotations and citations omitted).

Applying that standard, the Second Circuit has held that information obtained through civil discovery has been "publicly disclosed" for purposes of the statutory bar because it was filed with the court and available to anyone who wished to inspect the court file.  Id.  It has also found that allegations of corporate fraud disclosed by federal agents to a limited number of corporate employees in the course of executing a search warrant were publicly disclosed,

emphasizing the fact that even a limited disclosure was sufficient to put the allegations or transactions in the "public domain." Doe, 960 F.2d at 322-23.

In light of the Second Circuit's articulated standard and its past application, this Court concludes that information provided in response to the Kirks' FOIA requests was "publicly disclosed" for purposes of section 3730(e)(4)(A). The information, while not "widely disseminated," was in the public domain. It was potentially accessible to anyone capable of submitting a FOIA request. And critically, for purposes of assessing whether the information was sufficiently publicly disclosed to trigger the statutory bar, it "would have been equally available to strangers to the fraudulent transaction had they chosen to look for it as it was to" the Kirks. Accord United States ex rel. Anti-Discrimination Ctr. of Metro N.Y. v. Weschester County, 495 F. Supp. 375, 380-81 (S.D.N.Y. 2007) (information obtained through state law FOIL request "is publicly disclosed information since it was as 'equally available' to others as it was to the Center, had others 'chosen to look for it'" (quoting Kreindler & Kreindler, 985 F.2d at 1158)).

The conclusion that the information provided in response to the Kirks' FOIA requests was "publicly disclosed" is bolstered by the fact that the very purpose of the FOIA is to ensure that agencies "make available *to the public*" certain categories of information. 5 U.S.C. § 552(a) (emphasis added); see also United States Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 774 (1989) (the "central purpose" of FOIA is to ensure that government records are "opened to the sharp eye of public scrutiny"). Accordingly, the U.S. Supreme Court has held that information obtained in response to a FOIA request was a "public disclosure" for purposes of the Consumer Product Safety Act, Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108-09 (1980). Finding that the DOL's response to the Kirks'

requests publicly disclosed the information in question, therefore, is consistent not only with this Circuit's FCA precedent, but also with both the statutory language and the Supreme Court's understanding of the purpose behind the FOIA.

For similar reasons, the overwhelming majority of courts to address the question have concluded that information obtained in response to a FOIA request constitutes a "public disclosure" for purposes of section 3730(e)(4)(A).  See, e.g., Mistick, 186 F.3d at 383; Grynberg, 389 F.3d at 1049; Burns, 186 F.3d at 723.  Indeed, the Court is aware of no circuit-level finding to the contrary.[14]

One court in this district has concluded that information obtained through a FOIA request was not "publicly disclosed."  See United States ex rel. Pentagon Techs. Int'l Ltd. v. CACI Int'l Inc., No. 94-Civ.-2925, 1996 WL 11299 (S.D.N.Y. Jan. 4, 1996).  That court reasoned that information obtained through FOIA, unlike information obtained through civil discovery, was not in the public domain because it was not lodged with a court but merely disclosed to a private citizen.  Id. at *9.  This Court finds that reasoning unpersuasive.  When the DOL responded to the Kirks' FOIA requests, it disclosed "to the public" the information sought.  5 U.S.C § 522(a).  That only one person placed the FOIA requests rather than one thousand does not render the responses "private."  It merely means the disclosures were not widespread.  And as noted, the Second Circuit has clearly considered—and rejected—a "widespread" or "widely disseminated" public disclosure requirement, instead requiring, at most, the potential for more widespread

---

[14] As discussed below, the Ninth Circuit has held that information obtained through a FOIA request is not disclosed through one of section 3730(e)(4)(A)'s enumerated sources, that the list statute's list is "exclusive," and accordingly, that information obtained through a FOIA request does not bar an FCA action unless the information "is from one of the enumerated sources."  Haight, 1147 F.3d at 1152.  However, that Court did not dispute that if the response to a FOIA request included information from one of the statute's enumerated sources, the response "publicly disclosed" that information for purposes of the jurisdictional bar.  Id. at 1156.  The Fourth Circuit similarly observed, in a footnote to an unpublished opinion, that section 3730(e)(4)(A)'s list of sources was exclusive and that a response to a FOIA request was not on it.  But like the Ninth Circuit, it expressed no opinion as to whether or not the information obtained through a FOIA request was "publicly disclosed."  See Bondy, 2001 WL 1397852, at *2 n.2.

accessibility.  That requirement is satisfied on these facts because the information in question

here was just as accessible to any member of the public as it was to the Kirks had others chosen

to look for it.  Accordingly, the information disclosed by the DOL to the Kirks pursuant to their

FOIA requests was in the public domain, and therefore, was "publicly disclosed" for purposes of

section 3730(e)(4)(A).

b.    . . . of the Allegations or Transactions . . .

Having so found, the Court pauses briefly to consider whether the public disclosure

included the "allegations or transactions" underlying relator's claims.  The Second Circuit has

not yet addressed the question of what disclosure is necessary to meet that standard, but courts

that have considered the issue have all adopted similar approaches.  The D.C. Circuit has

articulated a "mathematical illustration" endorsed by several other courts whereby:

> [I]f X + Y = Z, Z represents the <u>allegation</u> of fraud and X and Y represent its
> essential elements.  In order to disclose the fraudulent <u>transaction</u> publicly, the
> combination of X and Y must be revealed from which readers or listeners may
> infer Z, i.e. the conclusion that fraud has been committed.

<u>United States ex rel. Springfield Terminal Ry. v. Quinn</u>, 14 F.3d 645, 654 (D.C. Cir. 1994).  As

the D.C. Circuit explained more generally, "Congress sought to prohibit <u>qui tam</u> actions only

when either the allegation of fraud or the critical elements of the fraudulent transaction were in

the public domain."  <u>Id.</u>  The Tenth Circuit, while declining to adopt a "mathematical formula,"

has similarly found claims barred where, after the relevant disclosure, "the public domain

contained <u>all</u> the elemental aspects of the allegedly fraudulent transaction."  <u>Grynberg</u>, 389 F.3d

at 1050.

Adopting that reasoning, this Court looks to whether, after the relevant disclosure, all the

critical elements of the alleged fraudulent transaction were in the public domain.  <u>Accord United</u>

<u>States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods., Inc.</u>, No. 00-6593, 2004 WL

22

74310, at *3 (S.D.N.Y. Jan. 15, 2004) (SHS) ("Put in words rather than single letters, a qui tam action is barred where there is enough information in the public domain to expose the fraud.") The "critical elements" of Kirk's claim are: (1) Schindler obtained contracts (2) requiring an express certification pursuant to 48 C.F.R. § 52.222-38 that Schindler had filed VETS-100 reports, and (3) Schindler had not actually filed those reports.  Indisputably, the first element has long been in the public domain.  Indeed, in his pleadings, Kirk provides lists of Schindler's government contracts that he obtained from the Department of Veterans Affairs public website. (Exs. B-F to Am. Compl.)  Similarly, the second element can be readily deduced from the public domain—the same website Kirk relies on lists the value of each contract and the date it was entered into, all the information necessary to determine whether the contract would be covered by VEVRAA and 48 C.F.R. § 52.222-38, both of which are also in the public domain.

The third element, to the extent relator avers he can establish it, must come directly from the DOL's series of responses to the Kirks' FOIA requests because Kirk offers no other basis for a factfinder to conclude that Schindler failed to file VETS-100 reports.  Since the Court has already determined that those FOIA responses "publicly disclosed" the information contained therein for purposes of section 3730(e)(4)(A), after those responses, each element of Kirk's claim was in the public domain, and accordingly, the "allegations or transactions" underlying this action had been publicly disclosed.

c. . . . Via an Enumerated Source

Having determined that the DOL's response to Kirk's FOIA requests constituted a "public disclosure of [the] allegations or transactions" underlying relator's claims, the Court must next consider whether the disclosure was made via one of the statute's enumerated sources. Schindler contends that the Kirks' FOIA requests prompted administrative investigations within

the meaning of the statute, and that the DOL's responses constituted administrative reports.  The Court agrees.

Each time the DOL received one of the Kirks' FOIA requests, it was required to look into the matters underlying the request; determine what, if any, information was responsive to the request; and produce to the requesting party the documents sought, or an explanation for why the documents could not be provided or were exempt from disclosure.  As the Third Circuit concluded on very similar facts, that process, which was undertaken by the DOL (unquestionably an "administrative" body), entailed an "investigation" and produced a "report" as those words are commonly used and defined.  See Mistick, 186 F.3d at 383-84.  Indeed, the Oxford English Dictionary defines an "investigation" as the "making of a search or inquiry" and a "report" as "a formal statement of the results of an investigation."  Accord id. (collecting definitions of both terms).  Here, the Kirks' requests were handled by the Chief of the Investigation and Compliance Division within the DOL's Office of Veteran's Employment and Training, who, in his own words, conducted a "search," made a "determination" and produced, on official stationary, a document setting forth the results of his inquiry.  (See, e.g., Ex. G to Kirk Aff.)  Consistent with standard definitions of both terms, that process entailed an "investigation" and produced a "report."[15]

Relying heavily on one Ninth Circuit opinion, Kirk argues that a response to a FOIA request is "not necessarily a report or investigation, although it can be, if it is from one of the sources enumerated in the statute."  Haight, 445 F.3d at 1153.  Kirk argues that since the information requested and produced in this case did not itself stem from one of section

---

[15] While the first two FOIA requests where handled for the DOL by the Chief of the Investigation and Compliance Division, the Kirks' third FOIA request was handled by the Assistant Director of the Office of Agency Management and Budget for the Veterans Employment and Training Service.  That official responded by describing a similar investigatory process and producing a similar report (Ex. I to Kirk Aff.), and for purposes of this analysis, the difference is irrelevant.

3730(e)(4)(A)'s enumerated sources, the DOL's responses to the Kirks' FOIA requests are likewise not from an enumerated source.  The argument is unconvincing.

The Ninth Circuit's opinion rests on a distinction it sought to draw between FOIA requests on the one hand and government investigations and reports on the other. As that court argued, "a FOIA request is a mechanism for duplicating records that are in the possession of the federal government" while, "[i]n contrast, reports and investigations generally involve independent work product" and "independent governmental leg-work."  Id. (internal citations and quotations omitted).  Accordingly, "labeling any response to a FOIA request a 'report' or 'investigation' would ignore the way in which each of the enumerated sources involves government work product."  Id.

Whatever validity that general distinction might have in other contexts, it is belied by the facts presented here.  In this case, the DOL's Chief of Investigation and Compliance within the DOL's Office of Veteran's Employment and Training conducted a search and prepared a letter detailing that search and its results, a work process that produced a substantive government work product, facts Kirk does not appear to dispute.  That the investigation and the resulting report may not have been lengthy does not obscure the fact that an administrative body conducted an investigation and produced a report disclosing to members of the public the critical elements of Kirk's claims.  Simply put, before the DOL responded to the Kirks' FOIA requests, this relator had no claim—no personal knowledge sufficient to support even an allegation that Schindler had defrauded the government.  Cf. United States ex rel. Lamers v. City of Green Bay, 998 F. Supp. 971, 977 (E.D. Wis. 1998) ("The basic qui tam idea is that private citizens with personal knowledge of fraud against the government may bring suit on the government's behalf in return for a cut of the judgment proceeds should they prevail." (emphasis added)); see also United

States ex rel. Lissack v. Sakura Global Capital Mkts., Inc., No. 95-civ.1363, 2003 WL 21998968, at *4 (S.D.N.Y. Aug. 21, 2003) (same).

Therefore, on these facts, the Court finds that the allegations or transactions underlying Kirk's claims were publicly disclosed via one of section 3730(e)(4)(A)'s enumerated sources.

2.    *"Based Upon"*

For the jurisdictional bar to apply, the relator's claims must also be "based upon" the public disclosure.  That requirement is satisfied if "the qui tam action . . . is based in any part upon publicly disclosed allegations or transactions."  Kreindler & Kreindler, 985 F.2d at 1158 (quoting United States ex rel. Precision Co. v. Koch Indus., 971 F.2d 548, 553 (10th Cir. 1992)) (emphasis added).

Here, Kirk's claims are plainly "based upon" the publicly disclosed allegations or transactions.  As noted in detail above, the public disclosures form the core of Kirk's claims, serving as his only evidence of the most critical element of his claim—that Schindler allegedly failed to file VETS-100 reports for several of the years covered by this action.[16]  That Kirk claims to be able to supplement the publicly disclosed information by contributing additional knowledge gleaned during his time as an "insider" is irrelevant, since the standard is met if the FCA action is based "in any part" on the publicly disclosed allegations or transaction.

The Court therefore finds Kirk's action to be "based upon" the publicly disclosed allegations or transactions.

---

[16] Lest there be any dispute that the DOL's responses to the Kirk's FOIA requests served as Kirk's sole basis for concluding that Schindler failed to file VETS-100 reports for the years covered by the complaint, the Court takes note of the fact that Kirk's administrative challenge to Schindler's VEVRAA compliance, filed several months before the DOL responded to the Kirks' FOIA requests, makes no mention of Schindler's alleged failure to file VETS-100 reports in a timely fashion, despite otherwise alleging every other complaint and VEVRAA violation specified in this action.  (Ex. A to Kirk Aff.)

3.   *Original Source*

Finally, Kirk argues that even if his claim is based upon allegations or transactions that were publicly disclosed via an enumerated source, his action is not barred because he is the "original source" of the information.  An original source is an "individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government prior to filing an action . . . which is based on the information."  31 U.S.C. § 3730(e)(4)(B).  The Supreme Court has recently clarified that the phrase "information on which the allegations are based" in the statute refers to the "information upon which the [relator's] allegations are based."  Rockwell Int'l Corp. v. United States, 549 U.S. 457, 470-71 (2007).

Kirk fails to qualify as an original source because he cannot establish "direct and independent knowledge" of the information on which his allegations were based prior to the DOL's response to his FOIA request.  As the Second Circuit has explained, "a qui tam plaintiff does not satisfy the [direct and independent knowledge] requirement if a third party is 'the source of the core information' upon which the qui tam complaint is based."  United States ex rel. Dhawan v. N.Y. Med. Ctr., 252 F.3d. 118, 121 (2d Cir. 2001) (quoting Kreindler & Kreindler, 985 F.2d at 1159).  Here, as set forth at length above, the DOL—through its responses to the Kirks' FOIA requests—was the source of the "core information" upon which his complaint is based.

Moreover, the fact that Kirk did some "independent research" to compile the information relevant to his allegations by submitting a FOIA request or obtaining lists of Schindler's government contracts from a government website does not render him the original source of those claims.  See Kreindler & Kreindler, 985 F.2d at 1159 ("The fact that [relator] conducted

some collateral research and investigations regarding the [fraud] . . . does not establish 'direct and independent knowledge of the information on which the allegations are based' within the meaning of § 3730(e)(4)(B)."); see also United States ex rel. Alcohol Found., Inc. v. Kalmanovitz, 186 F. Supp. 2d 458, 463 (S.D.N.Y. 2002) (relator not an "original source" despite contending that it's allegations constituted a "'mosiac' of information that shows a fraud that an average member of the public could neither understand . . . nor perceive a fraud" from).

Therefore Kirk cannot qualify as an "original source" of the information upon which his allegations are based.

## IV. CONCLUSION

Because the Court finds that many of Kirk's allegations fail to state a claim under the FCA and that Kirk's remaining claims are barred as "publicly disclosed" pursuant to 31 U.S.C. § 3730(e)(4)(A), defendant's motion to dismiss the amended complaint is granted. The Clerk of Court is directed to enter judgment dismissing the complaint.

Dated: New York, New York
       March 30, 2009

SO ORDERED:

Sidney H. Stein, U.S.D.J.

28