UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel*.
DANIEL KIRK,

                                    Plaintiff/Relator,

              -against-

SCHINDLER ELEVATOR CORP.,

                                    Defendant.

05-Cv-2917 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

Daniel Kirk, a Vietnam veteran and former employee of defendant Schindler Elevator Corporation, has brought this action pursuant to the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*., alleging that Schindler, a government contractor, submitted false reports to the federal government in violation of the Vietnam Era Veterans Readjustment Assistance Act ("VEVRAA"), 38 U.S.C. § 4212.  VEVRAA requires that contractors who do business with the federal government submit annual reports to the Secretary of Labor (the "VETS-100 reports") providing certain information about the number of those veterans who are covered by the statute and employed by the contractor.  Kirk claims that Schindler obtained contracts and payments from the federal government by certifying its compliance with VEVRAA when it had in fact knowingly filed false VETS-100 reports with the government.

This action has had a long and tortuous history, making trips to the U.S. Court of Appeals for the Second Circuit and the U.S. Supreme Court before winding its way back to this Court.  After extensive discovery, Schindler moved for summary judgment in its favor pursuant to Fed. R. Civ. P. 56.  Because there is no genuine dispute of material fact as to an essential element of Kirk's claim—that Schindler knowingly submitted

false VETS-100 reports to the government—this Court grants Schindler's motion and brings this litigation to a close.

## I.  BACKGROUND

### A.  VEVRAA Regulations

Before turning to the facts of this case, it is helpful to review the relevant provisions of VEVRAA and the regulations implementing it. VEVRAA imposes numerous requirements on contracts "entered into by any department or agency of the United States for the procurement of personal property and nonpersonal services (including construction)" if the value of the contract exceeds a certain monetary threshold.  38 U.S.C. § 4212(a)(1).  Of pertinence here, VEVRAA prescribes that each contractor subject to VEVRAA shall, in accordance with the applicable regulations promulgated by the Secretary of Labor, submit annual VETS-100 reports to the Secretary of Labor on—

> (A) the number of employees in the workforce of such contractor, by job category and hiring location, and the number of such employees, by job category and hiring location, who are qualified covered veterans;

> (B) the total number of new employees hired by the contractor during the period covered by the report and the number of such employees who are qualified covered veterans; and

> (C) the maximum number and the minimum number of employees of such contractor during the period covered by the report.

38 U.S.C. § 4212(d)(1) (2002);[1] 48 C.F.R. § 52.222-37(a)-(c).  "The number of veterans reported . . . must be based on data known to

---

[1] Congress has amended 38 U.S.C. § 4212 several times throughout the operative time period of this litigation, which concerns VETS-100 reports submitted in 1999-2006.  In the version of the statute effective October 31, 1998 to October 31, 2000, the term "covered veteran" described special disabled veterans, veterans of the Vietnam war, and other veterans who served on active duty during a war or in a campaign or

contractors and subcontractors when completing their VETS-100 Reports. Contractors' and subcontractors' knowledge of veteran[] status may be obtained in a variety of ways, including, in response to an invitation to applicants to self-identify in accordance with 41 C.F.R. § 60-250.42, voluntary self-disclosures by protected incumbent veterans, or actual knowledge of an employee's veteran status." 41 C.F.R. § 61-250.10(e); *see also* 48 C.F.R. § 52.222-37(e) (2001) ("The Contractor shall base the count of veterans reported according to paragraph (a) of this clause on voluntary disclosure."); 41 C.F.R. § 60-250.42.

In a contract with the federal government, a contractor must certify that "if it is subject to the reporting requirements of 38 U.S.C. 4212(d) (i.e., if it has any contract containing Federal Acquisition Regulation clause 52.222–37, Employment Reports on Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans), it has submitted the most recent VETS–100 Report required by that clause."  48 C.F.R. § 52.222-38 (2001).  Accordingly, "[n]o agency may obligate or expend funds appropriated for the agency" pursuant to 38 U.S.C. § 4212 if a contractor who is required by section 4212(d) to submit a VETS-100 report fails to submit such report. 31 U.S.C. § 1354 (1998); *see also* 48 C.F.R. § 22.1302(b).

Nonetheless, the regulations exempt certain contracts from this requirement, including contracts for the procurement of commercial items, which are items, other than real property, that are customarily used by the general public and have been offered for sale, lease, or license to the general public.  *See* 48 C.F.R. § 22.1302(b) (2001); 48 C.F.R. § 2.101; 48 C.F.R.

---

expedition for which a campaign badge has been authorized**.**  38 U.S.C. § 4212 (1998). The category "recently separated veterans" was added effective November 1, 2000.  38 U.S.C. § 4212 (2000).  In the version of the statute effective November 7, 2002, Congress added the category "[v]eterans who, while serving on active duty in the Armed Forces, participated in a United States military operation for which an Armed Forces service medal was awarded pursuant to Executive Order No. 12985 (61 Fed. Reg. 1209)" and removed Vietnam veterans as a separate category. 38 U.S.C. § 4212 (2002).

§ 12.503(a)(5).  This definition includes installation, maintenance, repair and training services if (1) they are provided in support of a commercial item and (2) similar services are provided contemporaneously to the general public on similar terms. *See* 48 C.F.R. § 2.101.

To obtain information on veteran status to report to the federal government, contractors must invite their employees to self-identify their veteran status.  In simplified terms, for most of the relevant time period here, the regulations required contractors to invite special disabled veterans and veterans of the Vietnam era to self-identify as such before an applicant began his or her employment duties.  *See* 41 C.F.R. § 60-250.42 (1998).  In 2006, the regulation required that contractors also invite "recently separated veterans" and "other protected veterans" to self-identify before the applicant began his or her employment duties. 41 C.F.R. § 60-250.42 (2006).[2]

### B.   The Present Litigation

The following facts are undisputed in this action unless otherwise noted.

Schindler Elevator Corp. manufactures vertical transportation equipment, including elevators and escalators, and offers installation, maintenance, repair, and modernization services in support of its products. (Statement of Material Undisputed Facts In Supp. of Schindler Elevator Corporation's Mot. for Summ. J. ("Def.'s 56.1") ¶ 2; Rule 56.1 Counter-Statement of Material Facts in Opp'n to Schindler's Mot. for Summ. J. ("Pl.'s Counter-56.1") ¶ 2.)  In 1989, the Schindler Group, which

---

[2] The regulations do not require that a contractor solicit information about veteran status from its *existing* workforce to complete the VETS-100 reports. *See id.*; Annual Report From Federal Contractors, 66 Fed. Reg. 51998-01, 52001 (2001) ("Contractors and subcontractors are not required to survey their workforces to solicit information about veterans' status for the purpose of completing the VETS-100 Report.").  The requirement is simply that applicants be asked to self-identify as a certain type of veteran before they begin their employment duties.

is based in Switzerland and owns Schindler Elevator Corp., acquired Westinghouse Electric Corp.'s elevator division, including Millar Elevator Industries ("MEI"). (Def.'s 56.1 ¶¶ 1, 4; Pl.'s Counter-56.1 ¶¶ 1, 4.)  One year later, the service division of Schindler based in Holland, Ohio "was converted to a division branded as Millar Elevator Service Company" ("MEC"). (Def.'s 56.1 ¶ 4; Pl.'s Counter-56.1 ¶ 4.)

Schindler Group operated MEC and MEI as separate divisions until 2002 when Schindler integrated the Millar operations into its own. (Def.'s 56.1 ¶ 6; Pl.'s Counter-56.1 ¶ 6.)  MEC and MEI offered maintenance, repair, and modernization services for elevators and other vertical transportation equipment, but unlike Schindler Elevator Corp., they did not manufacture the equipment or provide installation services. (Def.'s 56.1 ¶ 5; Pl.'s Counter-56.1 ¶ 5.)  Throughout the operative time period, Schindler, MEI, and MEC contracted with the federal government to provide vertical transportation products and services. (Def.'s 56.1 ¶¶ 3, 6; Pl.'s Counter-56.1 ¶¶ 3, 6.)

In 1978, MEI hired Daniel Kirk, a Vietnam-era veteran, as a journeyman mechanic. (Def.'s 56.1 ¶ 61; Pl.'s Counter-56.1 ¶ 61; Dep. of Daniel Kirk, dated Aug. 16, 2013 ("Kirk Dep.") at 14-16, Ex. 8 to Decl. of Steven A. Reiss in Supp. of Schindler Elevator Corporation's Mot. for Summ. J., dated June 23, 2014 ("Reiss Decl."); Decl. of Daniel Kirk in Opp'n to Def.'s Mot. for Summ. J., dated Aug. 7, 2014 ("Kirk Decl.") ¶¶ 2-3.) Seven years later, Kirk became a salaried employee at MEI and was promoted to field supervisor. (Def.'s 56.1 ¶ 62; Pl.'s Counter-56.1 ¶ 62; Kirk Dep. at 14-16.)  In his MEI employment documentation, Kirk was asked to identify his military status or draft classification, but he declined to do so. (Ex. 56 to Reiss Decl.)  When Schindler acquired MEI in 1989, Kirk continued working for MEI. (Def.'s 56.1 ¶ 63; Pl.'s Counter-56.1 ¶ 63.) After Schindler absorbed MEI in 2002, Kirk worked directly for Schindler until he was demoted in 2003 and resigned. (Def.'s 56.1 ¶ 64; Pl.'s Counter-56.1 ¶ 64.)  It is fair to say that the severing of the employment relationship

was not amicable from Kirk's perspective. (*See* Kirk Decl. ¶ 9; Kirk Dep. at 41:21-23.)

Following his resignation, Kirk filed a complaint with the Office of Federal Contract Compliance Programs ("OFCCP") at the Department of Labor ("DOL"), alleging that Schindler had improperly demoted and constructively terminated Kirk because he was a veteran. (Def.'s 56.1 ¶ 65; Exs. 57, 59 to Reiss Decl.)  Kirk also complained that Schindler failed to comply with various VEVRAA requirements.  (Exs. 57-59 to Reiss Decl.) As a result of Kirk's complaint, the district office of the OFCCP began an investigation into Schindler's compliance with VEVRAA and found insufficient evidence to support Kirk's allegations.  (Def.'s 56.1 ¶¶ 66, 70-72; Exs. 57-58, 61, 65 to Reiss Decl.)  After Kirk requested that the regional OFCCP office review that determination, the Northeast Region's Acting Deputy Regional Director affirmed the findings of the district office and concluded that:

> [T]he evidence in [Kirk's] case file did not support the allegations made in [Kirk's] letter of March 7, 2005 regarding Schindler's alleged failure to file the requisite VETS-100 forms . . . or its alleged failure to invite covered veterans to self-identify; nor did the evidence support [Kirk's] claim that [Kirk was] demoted and constructively discharged . . . by Schindler because of its alleged failure to ask [Kirk] to self-identify as a Vietnam era veteran.

> (Ex. 61 to Reiss Decl.)

The OFCCP also audited Schindler in 2007 and 2008 and found no actionable conduct. (Ex. 75 to Reiss Decl.; Def.'s 56.1 ¶ 69; Pl.'s Counter-56.1 ¶ 69.)

In addition to his administrative complaint, Kirk instituted a lawsuit in New York state court against Schindler on the grounds that Schindler improperly demoted and constructively terminated Kirk, withheld his severance and vacation pay, and defamed him.  (Ex. 60 to Reiss Decl.)

That action was removed by Schindler to this Court and ultimately dismissed. (Ex. 62 to Reiss Decl.)

In 2005, Kirk brought the present action, on behalf of the United States, alleging various False Claims Act violations as a result of Schindler's purported non-compliance with VEVRAA. The lawsuit traveled to the Second Circuit after it was initially dismissed by this Court, went to the U.S. Supreme Court on a jurisdictional issue, and returned to this Court in 2011. The gravamen of the operative complaint is that Schindler violated the False Claims Act, 31 U.S.C. § 3729(a), by (1) knowingly presenting false claims for payment to the federal government and (2) knowingly submitting false VETS-100 reports material to false claims for payment during the period of 1999-2007. (Dkt. No. 58.) Kirk's allegations essentially allege that Schindler had no "mechanism for counting veterans" and therefore Schindler's VETS-100 reports "must have been contrived." *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 926 F. Supp. 2d 510, 522 (S.D.N.Y. 2013). Kirk draws upon his personal experience as a Schindler employee and his knowledge of the makeup of the workforce in lodging these allegations.

The parties have now engaged in extensive fact and expert discovery, and the government has declined to intervene in this case on two separate occasions. (Dkt. Nos. 14, 126.) Based on the record proffered by the parties, it is undisputed that during the relevant time period, Schindler gave its new employees an opportunity to self-identify their veteran status in various employment forms. (*See* Exs. 21-30 to Reiss Decl; Dep. of Annette Selvaggio, dated Aug. 8, 2013 ("Selvaggio Dep.") at 23-24, 67, 143-46, 227-28, Ex. 4 to Reiss Decl.; Dep. of Tammy Crytzer, dated Oct. 9, 2013 ("Crytzer Dep.") at 172-77, Ex. 5 to Reiss Decl.; Dep. of Michael Shields, dated Aug. 6, 2013 ("Shields Dep.") at 30-31, Ex. 1 to Reiss Decl.; Dep. of Timothy Grace, dated Sept. 17, 2013 ("Grace Dep.") at 66-67, Ex. 12 to Reiss Decl.; Dep. of Claudia Cisternino, dated July 31, 2013 ("Cisternino Dep.") at 62, 112-15, 124-26, Ex. 6 to Reiss Decl.) Kirk disputes whether these

forms were fully compliant with the pertinent regulations; for instance, he disputes whether the forms contained all of the requisite veteran categories[3] and whether they contained notices that the information new employees provided was voluntary and confidential. (*See, e.g.*, Pl.'s Counter-56.1 ¶ 34.)  But Kirk neither disputes that the forms existed nor that they were given to at least some new employees at MEI, MEC, and Schindler.

Schindler had employees dedicated to collecting and aggregating the self-identification data for the VETS-100 reports.  Annette Selvaggio, Schindler's Manager of Equal Employment Opportunity, Safety, and Affirmative Action Programs, was charged with ensuring that Schindler, MEC, and MEI complied with VEVRAA. (Def.'s 56.1 ¶ 30; Pl.'s Counter-56.1 ¶ 30.)  Included in her responsibilities was the preparation and filing of the VETS-100 reports. (Def.'s 56.1 ¶ 31; Pl.'s Counter-56.1 ¶ 31.)  Tammy Crytzer, a senior Human Resources Representative, was responsible for maintaining the Human Resources Information System ("HRIS") database, which housed the veteran information provided by new employees in the self-identification forms. (Def.'s 56.1 ¶¶ 40-41; Pl.'s Counter-56.1 ¶¶ 40-41.)  Crytzer generated spreadsheets and reports, identifying the veteran status of Schindler, MEC, and MEI employees for Selvaggio's use in completing the VETS-100 reports. (Def.'s 56.1 ¶ 42; Pl.'s Counter-56.1 ¶ 42; *see also* Exs. 31-37 to Reiss Decl.)  Schindler regularly audited the HRIS database. (Def.'s 56.1 ¶ 43; Pl.'s Counter-56.1 ¶ 43.)

When Schindler's human resources department learned of an error in an employee's veteran status, they corrected the HRIS database. (Exs. 50,

---

[3] The Court notes that 41 C.F.R. § 60-250.42—the regulation that requires contractors to invite new employees to self-identify—is limited to two veteran categories for most of the relevant time period: special disabled veterans and veterans of the Vietnam era. *See* 41 C.F.R. § 60-250.42 (1998).  Schindler's self-identification and employee data forms included disabled veterans and Vietnam veterans during this time. (*See* Exs. 21-23, 25-30 to Reiss Decl.)

53-54 to Reiss Decl.; *see also* Selvaggio Dep. at 211-14, 219-22; Crytzer Dep. at 63-64, 67-71, 85-87, 120-22.)  Similarly, Selvaggio affirmatively contacted the DOL when it did not send its annual VETS-100 filing information to Schindler. (Selvaggio Dep. at 75-76; *see also* Ex. 44 to Reiss Decl.)  In addition, Selvaggio reached out to the DOL's VETS-100 Help Desk to rectify any mistake she found in the reports Schindler had filed (Ex. 51 to Reiss Decl.; Selvaggio Dep. at 120-22; Def.'s 56.1 ¶ 56; Pl.'s Counter-56.1 ¶ 56).

Throughout the operative time period, Selvaggio consulted with the Equal Employment Advisory Council ("EEAC"), a consulting firm with expertise in federal contractor compliance, and the Equal Employment Opportunity Commission, attended classes on affirmative action programs in New York, and turned as well to the OFCCP for guidance regarding VEVRAA compliance. (Def.'s 56.1 ¶ 33; Selvaggio Dep. at 15-16, 74-75, 208-09.)  Kirk disputes that the EEAC consultant Schindler hired actually assisted Schindler with its VETS-100 reporting, but the portion of the consultant's deposition testimony Kirk relies on merely states that he does not remember discussing the self-identification requirements with Schindler in 2001; that excerpt says nothing about whether the consultant provided guidance to the company on the preparation or submittal of VETS-100 reports. (Pl.'s Counter-56.1 ¶ 33; Dep. of William Holmes, dated July 23, 2013 ("Holmes Dep.") at 53, Ex. 17 to Decl. of David E. Mollon in Opp'n to Def.'s Mot. for Summ. J., dated Aug. 8, 2014 ("Mollon Decl.").)

It is undisputed that Schindler submitted VETS-100 reports in all years relevant to this complaint except 2001.  The parties dispute whether Schindler submitted the reports for 2001; Schindler claims that it did. (Def.'s 56.1 ¶ 46; Pl.'s Counter-56.1 ¶ 46; Exs. 18, 43-49, 55 to Reiss Decl.) Although Schindler did not produce its 2001 VETS-100 reports in this litigation, both deposition testimony and contemporaneous documentary

evidence supports Schindler's assertion that it in fact filed VETS-100 reports in 2001.  (*See* Selvaggio Dep. at 73-74; Ex. 18 to Reiss Decl.)[4]

Schindler now moves for summary judgment on the grounds that Kirk has failed to adduce sufficient evidence to prove each element of an FCA claim:  falsity, scienter, materiality, and damages.[5]  Alternatively, Schindler contends that the contracts between Schindler and the federal government are contracts for commercial items and are therefore exempt from the VETS-100 reporting requirements pursuant to 48 C.F.R. § 22.1302(b).

## II.  LEGAL STANDARD

To succeed on a motion for summary judgment, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015).  In determining whether there is a genuine dispute of material fact, "we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks omitted).

---

[4] VEVRAA regulations only require employers to keep VETS-100 reports for two years from the date of the making of the record.  *See* 41 C.F.R. § 60–250.80(a) (1998).

[5] Schindler asserts that proving damages is an essential element of an FCA claim, but acknowledges that the U.S. Court of Appeals for the Second Circuit has never ruled on this issue and most other circuits have held that damages are *not* an element of an FCA claim. (*See* Def. Schindler Elevator Corporation's Reply Mem. in Further Supp. of its Mot. for Summ. J. at 14 n.9, Dkt. No. 172.)  The United States of America has submitted a statement of interest, disputing Schindler's contention regarding damages and urging the Court to find that economic injury to the government is not an element that must be alleged and proved to maintain an action pursuant to the FCA. (*See* Statement of Interest of the United States of America, Dkt. No. 171.)  The Court need not address this issue in order to resolve the motion, and it therefore declines to decide this open question.

"Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. More specifically, it must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson*, 781 F.3d at 44 (internal quotation marks omitted). "Summary judgment is appropriate 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Johnson*, 680 F.3d at 236 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### III. Discussion

#### A.   The False Claims Act

Congress enacted the False Claims Act ("FCA") "to help combat fraud against the federal government by persons who provide goods and services to it." *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 98-99 (2d Cir. 2010), *rev'd and remanded on other grounds*, 563 U.S. 401 (2011). The FCA imposes liability on persons who, *inter alia*, submit false claims for payment to the federal government. 31 U.S.C. § 3729(a)(1). The FCA also includes *qui tam* provisions that allow private citizens, such as Kirk, "who learn of fraud" to bring suit in the name of the United States government and to share in any eventual recovery. *Kirk*, 601 F.3d at 99 (citing 31 U.S.C. § 3730(b)-(d)).

Kirk brings his claims pursuant to 31 U.S.C. § 3729(a)(1) (2006) and § 3729(a)(1)(B) (2009).[6] According to those provisions, Schindler may be

_____

[6] Since the date Kirk filed this action, Congress has amended and renumbered the applicable provisions of the FCA, but made only certain amendments retroactive to claims pending on or before June 7, 2008. *See Kirk*, 601 F.3d at 113. "Because Kirk's claim was filed in March 2005, and was pending as of June 7, 2008, the potentially

liable to the federal government if it (1) "*knowingly* presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval;" and (2) "*knowingly* makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1) (2006); *id.* § 3729(a)(1)(B) (2009) (emphasis added).

To prevail at trial, Kirk must prove at least one of three cognizable theories of false or fraudulent claims:  (1) factual falsity; (2) express legal falsity; or (3) implied legal falsity.  Factually false claims are those where a "contractor supplies 'an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided,'—in other words, the contractor bills for something it did not provide." *Kirk*, 601 F.3d at 114 (citation omitted) (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)).  No party contends that Schindler did not provide the government with the elevators or services it contracted for. (*See, e.g.*, Kirk Dep. at 41:9-12.)

"An expressly false claim is . . . a claim that falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment."  *Mikes*, 274 F.3d at 698.  Contracts submitted by Schindler to the government that contain 48 C.F.R. § 52.222–38—in which the contractor represents that "it has submitted [its] most recent VETS–100 Report"—fall within the express legal falsity category.  *Kirk*, 601 F.3d at 114-15.  For those contracts submitted before 48 C.F.R. § 52.222–38 became effective or for those contracts that do not contain this provision, Kirk proceeds under an implied falsity theory.  "An implied false certification takes place where a statute expressly conditions payment on compliance with a given statute or regulation, and the contractor, while failing to comply with the statute or regulation (and while knowing that compliance is required), submits a claim for payment."  *Kirk*, 601 F.3d at

applicable provisions in this case are former § 3729(a)(1) . . . and current § 3729(a)(1)(B)." *Id.*

114.  Since 31 U.S.C. § 1354 conditions payment on the submittal of the VETS-100 reports, any claim for payment by Schindler—even without an express certification of compliance—may give rise to FCA liability. *Id.* at 114-15.

But a false certification alone is insufficient; Kirk must prove that Schindler *knowingly* submitted the false certification or claim for payment in order to establish FCA liability.  31 U.S.C. § 3729(a); *U.S. ex rel. Feldman v. van Gorp*, 697 F.3d 78, 86 (2d Cir. 2012); *Mikes*, 274 F.3d at 695-96, 703.  A contractor acts knowingly within the meaning of the FCA when it "has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information" it submits to the federal government.  31 U.S.C. § 3729(b).  The statute does not require proof of a specific intent to defraud.  *Id.*

The Second Circuit has further clarified that the requisite intent for FCA purposes "is the knowing presentation of what is known to be false as opposed to negligence or innocent mistake."  *Mikes*, 274 F.3d at 703 (internal quotation marks omitted).  "The notion of presenting a claim known to be false does not mean the claim is incorrect as a matter of proper accounting, but rather means it is a lie." *Id.*; *see also U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999) (As the FCA is "a fraud prevention statute," "violations of [agency] regulations are not fraud unless the violator knowingly lies to the government about them.").

Nonetheless, although Congress "specifically expressed its intention that the [FCA] not punish honest mistakes or incorrect claims submitted through mere negligence," *U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 109 (3d Cir. 2007) (internal quotation marks omitted), persons who submit claims must make a "limited" inquiry "as would be reasonable and prudent to conduct under the circumstances to ascertain the true and accurate basis of the claim" submitted.  S. Rep. No. 99-345, at 7, 20 (1986); *see also United States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d

436, 447 (S.D.N.Y. 1999). Ultimately, "[f]or a *qui tam* action to survive summary judgment, the relator must produce sufficient evidence to support an inference of knowing fraud." *U.S. ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1995), *cert. denied*, 516 U.S. 1043 (1996).

Viewing the evidence in the light most favorable to Kirk, the Court finds that there is no genuine dispute as to any material fact on an element essential to Kirk's case, and on which he will bear the burden of proof at trial: whether Schindler *knowingly* submitted a false claim or a false record material to a false claim for payment to the government. *See Celotex*, 477 U.S. at 322-23. The evidence in this extensive record is clear that Schindler did not commit knowing fraud; that is, it did not knowingly submit false VETS-100 reports or false claims for payment to the government.

### B.   Schindler did not knowingly file allegedly false VETS-100 reports or false claims for payment

From the beginning of this action, Kirk has alleged that Schindler either failed to submit VETS-100 reports to the federal government or fabricated the numbers it submitted because Schindler had no meaningful mechanism to track and report the veteran status of its employees. In moving for summary judgment, Schindler has shown the exact opposite— that Schindler in fact had a comprehensive process to collect and track the veteran status of its employees.

As set forth above, Schindler distributed forms to new employees, asking them to identify their veteran status. Schindler maintained a database of the information new employees volunteered and reported that information in its annual VETS-100 reports. Schindler also relied on guidance from the OFCCP and the EEAC consultant it hired to assist in submitting proper VETS-100 reports. Recognizing that a voluntary self-identification system is inherently imperfect, Schindler contends that any inaccuracies in its reports are not actionable because they are the result of

(1) a good faith interpretation of the applicable regulations or (2) an innocent mistake.

Kirk makes five principal arguments in an effort to establish a genuine dispute of material fact as to the element of scienter.  Each is unavailing.

### 1.  *Alleged lack of a written process*

First, Kirk contends that the absence of a formal written procedure by Schindler for collecting and tracking the veteran status of its employees demonstrates Schindler's knowledge that its VETS-100 reports were actually false.  This argument is baseless.  No statute or regulation requires that contractors have *written* procedures as to how they collect and track their employees' veteran status.  Kirk's bald assertion that the lack of a written procedure establishes Schindler's reckless indifference to VEVRAA's regulatory requirements is belied by the record in this case: Schindler circulated self-identification and employee data forms to new hires, maintained the information in its HRIS database, and generated its VETS-100 reports from that data. (*See, e.g.*, Def.'s 56.1 ¶¶ 40-42; Pl.'s Counter-56.1 ¶¶ 40-42; Exs. 21-30, 36 to Reiss Decl.; Selvaggio Dep. at 23-24, 61, 67, 143-46, 227-28; Crytzer Dep. at 172-77.)  Schindler's process— although not memorialized in a formal manual—is also captured in contemporaneous emails and memoranda among human resource employees. (*See, e.g.*, Exs. 18, 31, 55 to Reiss Decl.)

Kirk nonetheless asserts that Schindler's process was sufficiently inconsistent and haphazard as to allow a rational factfinder to infer that Schindler recklessly disregarded any falsity in the data it submitted in its VETS-100 reports.  Kirk relies on his expert, David Macpherson, who analyzed Schindler's 2007 HRIS file and found that while 70% of Schindler's non-union workforce had volunteered a veteran status, 94% of its union workforce (*i.e.*, 76% of its total workforce) had not done so. (Expert Report of David A. Macpherson, Ph.D., dated Nov. 15, 2013 ("Macpherson Rep.") at 9, Ex. 70 to Reiss Decl.)  The 94% figure is so large,

Kirk contends, that a rational fact-finder may infer that Schindler's process was so deeply flawed that Schindler knew that its VETS-100 reports were inaccurate.

As a threshold matter, the Court finds that the majority of Macpherson's report is essentially worthless.  He is not an expert on anything related to this case aside from general statistical analysis:  he admits he is not an expert in VEVRAA, VETS-100 reports, EEO regulations, or the FCA. (Dep. of David A. Macpherson, dated May 14, 2014 ("Macpherson Dep.") at 11-14, 40-41, Ex. 71 to Reiss Decl.)  He also did not independently review Schindler's 2007 HRIS file, but simply accepted the representations by the consulting firm with which he worked of what that data showed. (Macpherson Dep. at 20-21.)  Aside from a general aggregation of how many Schindler employees indicated a veteran status, his other analyses comparing Schindler's veteran records to external benchmarks and comparing Schindler's veteran statistics with other EEO statistics are marked by faulty assumptions and evince his utter lack of familiarity with the pertinent regulations.[7]

In addition, as already stated, VETS-100 reporting is based on the voluntary reporting of new employees.  Schindler is only required to report the *known* protected veterans of its workforce; that is, it must report the employees who have identified their veteran status to Schindler.  *See* 41 C.F.R. § 61-250.10(e); (*see, e.g.*, Selvaggio Dep. at 215:10-24).

-----

[7] As but one example, for purposes of comparing Schindler's veteran statistics to those in external benchmarks such as the American Community Survey, he concludes that all employees who failed to indicate a veteran status were non-veterans, even though this assumption defies common sense.  Because the forms are voluntary, many veterans may simply have opted not to set forth their status, but that does not mean that they are not a veteran.  As another example, Macpherson's comparison of the number of veterans reported in Schindler's 2006 VETS-100 reports with the number of total veterans in Schindler's 2007 HRIS file does not aid the relevant analysis whatsoever because the 2007 HRIS file includes veterans who are not protected by VEVRAA. (Macpherson Rep. at 6, 10-12.)

With these significant caveats in mind, the Court turns to the 2007 statistics Macpherson provided.  Schindler contends that Macpherson's analysis demonstrates that its process was working—the vast majority (70%) of its non-union workforce in 2007 had indicated a veteran status in response to its new hire questionnaires and Schindler collected and tracked those responses.  To the extent that its union employees had a lower response rate, Schindler asserts that its union employees may properly be excluded from its VETS-100 reports pursuant to 41 C.F.R. § 61-250.2(b)(2) and therefore any lack of data on those employees is irrelevant to the truth or falsity of its reports.[8]

41 C.F.R. § 61-250.2(b)(2) (2001) provides guidance to contractors on the definition of employee for VETS-100 reporting purposes.  The regulation states as follows:

> The term employee does not include persons who are hired on a casual basis for a specified time, or for the duration of a specified job, and who work on remote or scattered sites or locations where it is not practical or feasible for the employer to make a visual survey of the work force within the report period; for example, persons at a construction site whose employment relationship is expected to terminate with the end of the employees' work at the site; persons temporarily employed in any industry other than construction . . . who are obtained through a hiring hall or other referral arrangement . . . .

41 C.F.R. § 61-250.2(b)(2).  The VETS-100 instructions direct contractors "not [to] include employees specifically excluded as indicated

---

[8] In a similar vein, should Schindler's interpretation be correct—that union employees may be excluded from VETS-100 reporting—then any alleged failure to collect the veteran status information of its union employees would also be irrelevant to the government's decision to pay Schindler, as that decision is predicated on Schindler's submittal of VETS-100 reports, not Schindler's compliance with the full suite of VEVRAA regulations.  *See* 31 U.S.C. § 1354; *Mikes*, 274 F.3d at 697 ("[The FCA] does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions.").

in 41 C.F.R. § 61-250.2(b)(2)." (*See* Ex. 13 to Reiss Decl.)  Schindler essentially argues that it was not required to collect and report the veteran status of its union or "field hourly" employees because they came from a hiring hall and worked at one of Schindler's many field offices, in a warehouse, or on location, on a job-per-job basis for discrete periods of time. (*See, e.g.*, Selvaggio Dep. at 24-26, 37-38, 214-15, 217-19; Ex. 32 to Reiss Decl.; Dep. of John Quinn, dated Oct. 3, 2013 ("Quinn Dep.") at 29-30, Ex. 3 to Reiss Decl.)  Schindler thus took the position that union or field hourly employees did not need to be counted in the VETS-100 reports. (Selvaggio Dep. at 25, 218.)

Kirk contends that the union or field hourly employees should not have been excluded from the VETS-100 reports pursuant to 41 C.F.R. § 61-250.2(b)(2) for a variety of reasons, such as some union employees were not hired through hiring halls or hired as temporary employees (Kirk Decl. ¶¶ 12-13), and according to Kirk, workers on elevators—"one of the unmistakable indicia of urban life"—cannot be said to work in "remote or scattered locations." (Pl.-Relator's Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 2.)  However, whether or not the union or field hourly employees should have been excluded from the reports ultimately misses the mark; even assuming for purposes of argument that the VETS-100 reports were false because those workers were excluded from the reports, the pertinent question is whether Schindler submitted such reports, *knowing that they were false*.

"Where there are legitimate grounds for disagreement over the scope of a . . . regulatory provision, and the claimant's actions are in good faith, the claimant cannot be said to have knowingly presented a false claim." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 684 (5th Cir. 2003) (en banc) (Jones, J., concurring); *see also Lamers*, 168 F.3d at 1018-20; *U.S. ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000); *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464 (9th Cir. 1999) ("A contractor relying on a good faith interpretation of a regulation is not

subject to liability, not because his or her interpretation was correct or 'reasonable' but because the good faith nature of his or her action forecloses the possibility that the scienter requirement is met.").

Schindler's reliance on 41 C.F.R. § 61-250.2(b)(2) to exclude certain groups of employees pursuant to that regulation suggests an intent to abide by the law, not an effort to "bur[y] its head in the sand" and ignore it. *See Raymond*, 53 F. Supp. 2d at 447. Kirk proffers not a single piece of evidence that Schindler knew its interpretation of the regulation was wrong and then knowingly submitted false VETS-100 reports. This case is therefore distinguishable from other cases such as *Oliver*, which found a genuine dispute of material fact as to the defendant's knowledge where the relator had told the defendant that it "better hope the [Defense Contract Audit Agency] doesn't discover" certain information missing from its disclosures and the defendant responded that she should "forget about it," even after the agency expressed concern over the same issue. 195 F.3d at 465. Accordingly, the 2007 HRIS statistics do not establish a triable issue of material fact that Schindler had the requisite scienter for FCA liability.

### 2. OFCCP investigation note

Next, Kirk urges the Court to find a genuine dispute of material fact as to Schindler's knowledge of the alleged falsity of its VETS-100 reports because Selvaggio allegedly admitted in 2004 that Schindler had no process in place for identifying veterans. However, the document on which Kirk leans cannot bear the weight he puts on it. He cites the interview notes of an OFCCP compliance officer who interviewed Selvaggio as a result of Kirk's 2004 complaint to the OFCCP. (Ex. 11 to Mollon Decl.) According to those notes, Selvaggio told the compliance officer that there was no "process in place for employees to self-identify their veteran status." (*Id.*)

However, not only did Selvaggio neither review nor sign the interviewer's notes (*id.*), she in fact explicitly disavowed that statement under oath when she was deposed in this matter. (*See* Selvaggio Dep. at 143-46 ("That's wrong.  That's not true.  We have a process.  We always had a process. . . . I would never have said we didn't have a process.").)  The interview notes are clearly preliminary and incomplete—they contain several half sentences—and are wholly contradicted by the overwhelming evidence in this case *and* the actual factual findings of the very same compliance officer.  Specifically, the OFCCP concluded that "Schindler does have an affirmative action program for covered veterans, which include[s] an invitation for veterans to s[elf] identify their veteran status.  In addition, it completes an annual Vet-100 report to identify veteran employees." (Ex. 58 to Reiss Decl.)  Given the totality of the evidence on the issue of whether Schindler knowingly submitted false reports, even if the single page of notes—which is hearsay—were admissible, it would still fail to establish a genuine dispute as to whether Schindler recklessly disregarded the truth or falsity of the VETS-100 reports it submitted.  *See Mikes*, 274 F.3d at 703 ("Defendants have presented such overwhelming evidence of their genuine belief [in the veracity of their reports], we conclude as a matter of law they did not submit their claims with the requisite scienter.").

### 3.   *Internal emails*

Third, Kirk contends that certain internal Schindler emails reveal that those at Schindler responsible for the VETS-100 reports knew that field offices did not have complete and accurate information regarding the veteran status of its employees. (*See* Exs. 10, 12 to Mollon Decl.)  But the two documents Kirk points to fail to establish a genuine dispute as to whether Schindler knowingly submitted false VETS-100 reports.

In the first email exchange in 2000, an employee wrote to Crytzer that after she ran one of the reports, she did not "think all of the information [was] correct." (Ex. 10 to Mollon Decl.)  In response, Crytzer replied that

the errors may have been due to the conversion to a new database and "we should clean up" the veteran information. (*Id.*; *see also* Crytzer Dep. at 67-69.)  Crytzer also advised the employee about the applicable veterans codes her office should use. (*See* Ex. 10 to Mollon Decl.)

This email exchange demonstrates that Schindler was (1) monitoring the veteran information it had and (2) updating and correcting that information.  Contrary to Kirk's assertion, identifying errors in data collection or recognizing the need for better quality control does not constitute "reckless disregard" within the meaning of the FCA.  *See Hefner*, 495 F.3d at 110 ("The mere failure of a system to catch an error does not establish recklessness."); *Wang v. FMC Corp.*, 975 F.2d 1412, 1420-21 (9th Cir. 1992) ("Proof of one's mistakes . . . is not evidence that one is a cheat."), *overruled on other grounds by U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121 (9th Cir. 2015); *U.S. ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp.*, 298 F. Supp. 2d 91, 101-02 (D.D.C. 2004).  This is especially true when the records are based on an inherently imperfect self-identification system with data inputted from multiple offices. (*See, e.g.*, Selvaggio Dep. at 26; Crytzer Dep. at 175; Cisternino Dep. at 113-15.)

The second email exchange Kirk points to took place in 2003.  When Crytzer generated the VETS-100 report in 2003, she ran a separate analysis of the field hourly employees and reported that she "discovered that the offices have not been providing that info on any new or rehires." (*See* Ex. 12 to Mollon Decl.)  She advised Selvaggio that "we need to recommunicate this requirement." (*Id.*)  Again, these emails show that those responsible for the VETS-100 reports at Schindler were actively engaged in both generating the reports and ensuring proper data collection.  The two email exchanges over the period from 1999 to 2007 fail to raise a genuine issue of material fact regarding Schindler's scienter, particularly considering Schindler's position that it did not need to include union or field hourly employees in its VETS-100 reports pursuant to the regulations.

### 4.   *Cost-savings rationale*

Kirk further attempts to establish a genuine dispute of material fact by contending that Schindler purposefully made no effort to obtain information about the veteran status of its union employees in order to save the costs of obtaining the information.  That contention verges on the nonsensical.  The uncontroverted evidence in the record shows that veteran status *was* included in Schindler's new hire forms (*see* Exs. 21-30 to Reiss Decl.) and Schindler incurred no additional costs in collecting and reporting that information.  Selvaggio testified that there was no additional cost or burden associated with collecting and tracking employees' veteran status (*see* Selvaggio Dep. at 221), since Schindler was already obligated to provide the EEO with information on such other variables as sex and race (Cisternino Dep. at 62, 113-14); the human resources manager of MEI also confirmed that there were no financial costs to obtaining veteran status information because it was included with the "normal…new-hire package" (*id.* at 126-27).

Kirk solely relies on Schindler's commercial items expert who—in addition to testifying that he is not an expert on VEVRAA or costs—testified that a contractor told him that complying with all regulations could add another $100,000 in costs. (Dep. of Jacques S. Gansler, dated May 28, 2014 ("Gansler Dep.") at 96, Ex. 8 to Mollon Decl.)  Such speculative and hearsay testimony regarding an unknown contractor's costs—which says nothing about Schindler's process or costs—fails to raise a genuine dispute that Schindler had a financial motive to exclude its union employees and knowingly lie to the government in submitting its reports.

### 5.   *Employee declarations*

Kirk's last attempt at finding a dispute of material fact rests on his assertion that two long-time Schindler employees—himself and Walter Cooper—have no recollection of being asked by Schindler to self-identify

their veteran status.  (*See* Kirk Decl. ¶ 11; Decl. of Walter Cooper in Opp'n to Mot. for Summ. J., dated July 22, 2014 ("Cooper Decl.") ¶¶ 2, 7.)  This too fails to raise a triable issue as to whether Schindler knowingly submitted false VETS-100 reports.  Even if the Court were to consider Cooper's declaration,[9] the avowals that two employees who started as Millar employees in the 1970s do not recall being asked to self-identify after Millar was absorbed by Schindler more than ten years ago—when the regulations do not require contractors to solicit information about their existing workforce—is certainly insufficient to raise a genuine dispute here.[10]  *See* Annual Report From Federal Contractors, 66 Fed. Reg. 51998-01, 52001 (2001).

Even if Schindler had been required to (1) solicit Kirk and Cooper's veteran status and failed to do so or (2) provide them an opportunity to self-identify when they became Schindler employees (Kirk Decl. ¶ 12), testimony from two of Schindler's thousands of employees is ultimately immaterial and cannot support a finding by a rational factfinder that Schindler knowingly or recklessly submitted false VETS-100 reports in violation of its regulatory obligations.  *See, e.g.*, *Hefner*, 495 F.3d at 109-10 (affirming the grant of summary judgment to the defendants where the relator had presented no evidence that those responsible for submitting the claims—and not other employees—had actual knowledge that the claims were false).

In sum, the record in this case belies what Kirk has been arguing all along—that Schindler never submitted VETS-100 reports or plucked the numbers submitted out of thin air.  Kirk "really asks [this Court] to infer,

---

[9] In an order dated today, this Court grants Schindler's motion to exclude the declaration of Walter Cooper pursuant to Fed. R. Civ. P. 37.

[10] The Court notes that in an email to an OFCCP compliance officer, Cooper concedes that his veteran status "[c]arried over from Millar Elevator," which is not inconsistent with his declaration that he was never asked *by Schindler* to self-identify. (*Compare* Ex. 64 to Reiss Decl., *with* Cooper Decl. ¶ 7.)

based on a handful of [purported] technical violations . . . that [Schindler's] management consciously orchestrated a campaign to deceive the [federal government]." *Lamers*, 168 F.3d at 1019.  But this we cannot do.

Although Kirk points to what may be a few minor violations over an eight year period—a few missing numbers in a report, a problem with data entry, or confusion over a regulatory interpretation—there is no evidence that Schindler "was out to cheat the federal government out of its [money]." *Id*. at 1020.  In fact, Schindler not only relied on OFCCP and EEAC guidance, but was found to be in compliance with VEVRAA after Kirk complained to the OFCCP and has passed all relevant OFCCP audits. (Selvaggio Dep. at 15-16, 74-75, 208-09; Exs. 58, 75 to Reiss Decl.); *see Hefner*, 495 F.3d at 110; *Southland Mgmt. Corp.*, 326 F.3d at 682 ("The government's knowledge and acquiescence in its contractor's actions . . . [i]s 'highly relevant' . . . to show that the contractor did not submit payment claims in deliberate ignorance or reckless disregard of their truth or falsity." (citation omitted)); *Feldman*, 697 F.3d at 98 n.9.  Because Schindler has "proffered ample evidence . . . supporting [its] contention that [it] held a good faith belief" that its VETS-100 reports were truthful to the best of its knowledge, "plaintiff's unsupported allegations to the contrary do not raise a triable issue of fact sufficient to bar summary judgment."  *Mikes*, 274 F.3d at 704.[11]

## IV. CONCLUSION

At bottom, Kirk fundamentally misapprehends the very purpose of the FCA—the FCA is not a mechanism to police regulatory compliance with VEVRAA; it is a mechanism to hold liable contractors who defraud the federal government.  The record is uniform and overwhelming that Schindler did not knowingly submit false VETS-100 reports to the

---

[11] Since the Court finds that there is no genuine dispute as to whether Schindler knowingly submitted false VETS-100 reports, it does not consider Schindler's remaining arguments.

Department of Labor and therefore did not violate the FCA.  Accordingly, the Court grants Schindler's motion for summary judgment in its favor (Dkt. No. 150).  The Clerk of Court is directed to enter judgment accordingly.

Dated:  New York, New York
        September 10, 2015

SO ORDERED:

Sidney H. Stein, U.S.D.J.